CRIM v. RICE et al.

SAME v. TRIEST et al.

(Circuit Court of Appeals, Second Circuit. April 11, 1916.)

Nos. 254, 255.

1. EQUITY ⬲151—PLEADING—SCANDAL.
Where a bill charged fraudulent conduct against an attorney, without stating any facts to support the charge, such charge is scandalous, and should be stricken from the bill.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 380–382; Dec. Dig. ⬲151.]

2. BANKRUPTCY ⬲302(1)—ACTIONS BY TRUSTEE—PLEADING—SUFFICIENCY.
A bill by a trustee, attacking transactions and transfers by the bankrupt and payments of interest to the transferees, who at the time of the transfers were creditors, held insufficient to state any cause of action.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 456; Dec. Dig. ⬲302(1).]

3. EQUITY ⬲362—PLEADING—BILL.
Under Supreme Court equity rule 25 (33 Sup. Ct. xxv), declaring that it shall be sufficient that a bill in equity shall contain a short and simple statement of the ultimate facts upon which relief is sought, a bill containing many repetitions, redundancies, and statements of conclusions is subject to attack under rule 29 (33 Sup. Ct. xxvi).

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 758–761; Dec. Dig. ⬲362.]

Appeals from the District Court of the United States for the Southern District of New York.

Bills by John W. Crim, as trustee in bankruptcy, against Edwin T. Rice and others, and against Hans Triest and others. From decrees dismissing the bills, complainant appeals. Affirmed, and bills referred to District Court, to strike improper matter.

These are appeals by plaintiff, a trustee in bankruptcy, from four decrees entered in favor of various defendants (and coming up on two records), dismissing the bill of complaint, which is the same in both records. For brevity, defendants will be referred to as follows: Triest and Schramme as the "bankrupts," and the partnership of H. Marquardt & Co., composed of Triest and Schramme as the "partnership"; H. Marquardt & Co., Incorporated, as the "Company"; Banco Oriental and Descuento Espanol as the "Mexican banks"; various domestic banks and bankers as the "domestic banks"; Colonial Products Importing Company as "Colonial Company"; Standard Storage Warehouse Company as the "Standard Company"; and the remaining defendants as Ingersoll, Mitchell, Rice, and Edmunds.

R. M. Cahoone, of Brooklyn, N. Y., and John S. Wise, Jr., of New York City, for appellant.

Montague Lessler, J. N. Rosenberg, and A. A. Michell, all of New York City, for appellees Triest and others.

Steele & Otis, of New York City, for appellee Chatham & Phenix Nat. Bank.

Whitridge, Butler & Rice, of New York City, for appellee Brown Bros. & Co.

⬲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Frank M. Patterson, of New York City, for appellee Mechanics' & Metals Nat. Bank.

Rosenberg, Levis & Ball, of New York City (James N. Rosenberg, of New York City, of counsel), for appellees Rice and another.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

MAYER, District Judge (after stating the facts as above). The bill charges that: (1) On August 13, 1913, the bankrupts individually and as copartners of the partnership were adjudged bankrupts and plaintiff qualified as trustee in bankruptcy on October 30, 1913. (2) One Ingersoll was president of Colonial Company and solely the representative and agent of the bankrupts, who owned Colonial Company and conducted it as a part of their partnership business; for some time prior to November 1, 1911, bankrupts, partnership, Colonial Company, and Ingersoll were insolvent. (3) On or about November 1, 1911, designing to hinder, delay, and defraud the creditors of all the foregoing persons and businesses, the bankrupts, Ingersoll and others, unknown to plaintiff, entered into a plan to go through the formality of dissolving the partnership and to transfer its assets and those of Colonial Company to the control of themselves and the Mexican banks, which were creditors of the bankrupts—to an amount, as later appears, of over $300,000. The bankrupts declared the partnership dissolved, constituted Triest the liquidating partner, and transferred all the assets of the partnership and Colonial Company to the Company.

Having thus set forth that all the property was transferred, the bill alleges (4) that the Company was organized under the laws of New York, the good will and trade-name of the partnership transferred to it, as well as "large amounts of property, choses in action, rights, concessions, cash and claims"; but in the same paragraph it is charged "that no cash whatever was put into" the Company, except pretended cash subscriptions to stock made by the Mexican banks, this cash being loaned by the Company to the bankrupts, who paid it back to the Mexican banks, pretending to be in extinguishment and satisfaction of the debts due these banks from the partnership, so that the only assets which the Company received were certain properties, worth less than $80,000, which had been pledged by the bankrupts with the Mexican banks, and which, by agreement, were sold for the benefit of the Mexican banks and with no benefit to the Company.

In this somewhat bewildering situation, it next appears that all of the property of the bankrupts was transferred to the Mexican banks, except such as was "retained by the bankrupts or paid" to other creditors. In other words, everything was transferred except what was not transferred; but what was transferred and what was not transferred remained a mystery to the reader of the pleading. Charges of fraud and conspiracy and conclusions of fact are liberally and indiscriminately mingled with confused allegations of fact. As nearly as we can spell out what is meant up to this point in the bill, it appears that a failing partnership decided to liquidate, transferred for that purpose its assets, or some of them, to a corporation in which large

creditors took stock for their claims, that some pledged assets were sold for the benefit of the pledgees, and some assets were transferred to these same acknowledged creditors.

We now come to an entirely different transaction concerning parties having no relation to or with the Mexican banks. The bill goes on to allege that (5) the bankrupts and Ingersoll controlled the Standard Company, a corporation engaged in the storage warehouse business; (6) that the bankrupts stored and pretended to store merchandise in the warehouses of the Standard Company and issued forged and falsified negotiable warehouse receipts, of which they hypothecated a large amount with the domestic banks; (7) that about March 1, 1912, the domestic banks discovered these frauds, and knew about March 1, 1912, that the bankrupts, the partnership and Ingersoll were insolvent and had transferred their assets to the Company. There is no allegation that the partnership was in fact insolvent on March 1, 1912, and, so far as the bill enlightens us, it may not have been insolvent in view of the alleged extinguishment of debts; but, construing the bill most favorably to plaintiff, we will assume that it sets forth that the domestic banks knew that the partnership was insolvent on March 1, 1912.

The bill proceeds to state (8) that the domestic banks and defendants Rice and Edmunds entered into an agreement with the bankrupts and Ingersoll whereby the domestic banks took $200,000 of preferred and common stock of the Company for their debts and designated an employé of one of the banks as a director of the Company. We are not informed as to what was the capitalization of the Company, and therefore cannot ascertain from the bill what per cent. of the total issue is represented by the stock taken by the bankers—non constat it was a just percentage.

The next allegations are (9) that it was agreed the Company should pay the bankrupts and Ingersoll large salaries (though what these salaries were is not stated), and that from these salaries they should pay to Rice and Edmunds, as trustees, an amount equal to the interest upon the debts to the domestic banks, and that Rice and Edmunds should pay over these interest amounts to the domestic banks; (10) that amounts aggregating $11,470.72 over a period of two years were paid to certain of the domestic banks, and "other and further sums" not identified as to payee or amount. It is further alleged that (11) Rice and Edmunds knew of the insolvency of the partnership, and knew "all the facts herein contained and set forth," but nowhere is it alleged that Rice, Edmunds, or the domestic banks had anything whatever to do with the transactions with the Mexican banks, or were in any manner parties thereto, or had any relations of any kind with those banks.

[1] Finally, it is alleged (12) that defendant Michell, "an attorney and counselor at law at this bar, has been an active participant, director, designor, and operator and conspirator with the other defendants," from which the inference can be drawn that wrongful acts have been done by Michell, as an attorney. This grave charge is not supported by a single allegation of fact, and the bill as to this defendant is summarily dismissed, and this allegation (nineteenth) is ordered stricken

from the record and the files of this court, and referred to the District Court for similar action.

[2] Again eliminating epithets and conclusions of fact contained in the bill, what we make out of this part of the bill is that the domestic banks, discovering that serious frauds had been practiced upon them, took stock in the Company in the hope of saving the debts due them, safeguarded themselves by representation on the directorate of the Company, and made provision for the payment of interest to them. We agree with Judge Hough that the bill fails to set forth any facts constituting either a transaction offensive to section 44 of the New York Personal Property Law (known as the Bulk Sales Law [Consol. Laws, c. 41]), or transfers or conveyances in fraud of creditors in violation of section 35 of the same statute.

At most, the bill shows that the Mexican and domestic banks were preferred creditors. Appellant states in his brief that "it is not the contention of appellant that a debtor may not make a preferential payment," and it is elementary that preferences are not in themselves fraudulent, that they are often made in good faith, and, in the absence of fraud, must stand unless they come within the four months period prescribed by the bankruptcy statute.

The transactions with the Mexican banks were long prior to the bankruptcy, as was the alleged agreement with the domestic banks. The only transactions which may be within the four months period are those which are indefinitely alleged in paragraph seventeenth, where it is stated that the bankrupts and Ingersoll paid certain interest amounts to five domestic banks "up to March, 1914."

It is not only doubtful whether the bill contains the allegations necessary to state a cause of action to recover preferential payments, but in addition, there is nothing in paragraph seventeenth to show these payments of interest during the four months period; for that paragraph does not contain any information as to whether the payments were made after August 13, 1913, the date of adjudication of bankruptcy, or at a time anterior to the four months period.

[3] In connection with this bill, we think it desirable to call attention to that part of rule 25 of the Supreme Court equity rules (33 Sup. Ct. xxv), which provides:

"Hereafter it shall be sufficient that a bill in equity shall contain, in addition to the usual caption: * * * Third, a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence."

The purpose of the rule is manifest, and it is unnecessary to insert in a bill extraneous matter, which cannot afford information either to the court or opposing litigants. In this bill, many allegations are either repetitious or are phrased in language foreign to properly drawn pleadings. Thus we find that a defendant was "the agent, representative, straw man, employé, dummy, tool, and operator of the bankrupt defendants"; that defendants were guilty of "designing, contriving, and conspiring to swindle, cheat, deceive, hinder, delay, and defraud" creditors; that certain acts were "devices, fences, screens, and cloaks and legal disguises"; that one of the defendants "has been an active

participant, director, designor, and operator and conspirator"; that certain banks "have escaped publicity and criticism by the authorities for their negligence in lending money. * * *"

If, because of these expressions and the diffuse character of the bill, a motion had been made under rule 29 (33 Sup. Ct. xxvi), for failure to comply with rule 25, we think the District Court would have been justified in granting the motion on that ground.

The decrees are affirmed, with costs to defendants appearing by separate solicitors, all defendants appearing by one solicitor to have one bill of costs. It is further directed that paragraph nineteenth of the bill be stricken from the record and files of this court, and the bill referred to the District Court for similar action.